1 | TIMOTHY J. YOO (SBN 155531)
EVE H. KARASIK (SBN 155356)
2 | JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3 | 10250 Constellation Boulevard, Suite 1700
4 | Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
5 | Email: tjy@lnbyb.com, ehk@lnbyb.com, jyo@lnbyb.com

6
Proposed Attorneys for Chapter 11 Debtor
7 | and Debtor in Possession

8

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

11

12

| | | |
|---|---|---|
| In re | ) | Case No. 2:17-bk-17292-VZ |
| | ) | |
| CORNERSTONE, APPAREL, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | **DEBTOR'S EMERGENCY MOTION** |
| | ) | **FOR ENTRY OF AN ORDER** |
| | ) | **AUTHORIZING DEBTOR TO** |
| | ) | **PROVIDE ADEQUATE ASSURANCE** |
| | ) | **OF FUTURE PAYMENT TO UTILITY** |
| | ) | **COMPANIES PURSUANT TO 11 U.S.C.** |
| | ) | **§ 366; MEMORANDUM OF POINTS** |
| | ) | **AND AUTHORITIES IN SUPPORT** |
| | ) | **THEREOF** |
| | ) | |
| | ) | [Omnibus Declaration of Tae Yi Filed |
| | ) | Concurrently Herewith] |
| | ) | |
| | ) | Date:          June 20, 2017 |
| | ) | Time:          1:30 p.m. |
| | ) | Courtroom:  1368 |
| | ) | Location:     255 E. Temple Street |
| | ) |                     Los Angeles, California |
| | ) | |
| | ) | |

# SUMMARY

Pursuant to Local Bankruptcy Rules 2081-1(a)(4) and 9075-1, and 11 U.S.C. § 366, Cornerstone Apparel, Inc. d/b/a Papaya Clothing, a California corporation and the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"), hereby moves, on an emergency basis (the "Motion"), for the entry of an order authorizing the Debtor to provide adequate assurance of future payment to certain utility companies pursuant to 11 U.S.C. § 366(c).

The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on June 15, 2017 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a retailer doing business as Papaya Clothing offering stylish clothing at reasonable prices to its fashion-savvy customers in the 16 to 25 year old age range. The Debtor currently owns and operates 83 retail stores located shopping centers and malls throughout the United States (the "Retail Stores"). The Debtor is headquartered in Los Angeles, California, and currently employs a workforce of approximately 1,700 employees.

The Debtor conducts its business from its corporate office and warehouse facility located at 5807 Smithway Street, Commerce, California 90040 (the "Corporate Facility") and the 83 Retail Stores. In connection with the operation of the Debtor's business, the Debtor receives water, electricity, telephone, internet, trash and/or similar utility services from a number of utility companies (each a "Utility Company," and collectively, the "Utility Companies"). Given the importance of the services provided by the Utility Companies to the continued operation of the Debtor's business, it is crucial that the means of providing adequate assurance to the Utility Companies that provide utility services at the Debtor's Corporate Facility and the Retail Stores be determined promptly so that there is no interruption in the services provided.

The Debtor proposes that adequate "assurance of payment" be provided to the Utility Companies that provide utility services at the Debtor's Corporate Office and the Retail Stores, in the form of cash deposits, as authorized by Section 366(c)(1)(A)(i) of the Bankruptcy Code

("Cash Deposits").  Attached as **Exhibit "A"** to the Omnibus Declaration of Tae Yi (the "Yi Declaration") filed concurrently herewith and incorporated herein by this reference hereto, is a list of the Utility Companies that provide services to the Debtor's Corporate Office and the Retail Stores[1] and their respective utility accounts, which list also reflects the average monthly cost for utility consumption from the respective Utility Companies and the cash deposit amount proposed to be paid to each Utility Company.  The total aggregate amount of the Cash Deposits proposed to be paid by the Debtor is $116,356.  Generally, the Debtor is proposing to provide each Utility Company with a cash deposit in an amount equal to one month's average cost for utility consumption based on the historical utility costs incurred on the utility account(s) (as determined by the last three monthly or bi-monthly invoice amounts for such utility accounts).

In addition to the Cash Deposits, the Utility Companies will be kept current on all post-petition amounts payable to such Utility Companies.

Given the large number of Utility Companies which provide utility services to the Debtor at its Corporate Office and the Retail Stores, and the logistical difficulty and expense associated with issuing and distributing individual checks for the Cash Deposits to the Utility Companies within the first thirty (30) days of this Chapter 11 bankruptcy case, the Debtor seeks to establish the following procedures (the "Procedures") for providing access to the Cash Deposits to the Utility Companies:

1.    Upon the granting of this Motion, the total amount of the Cash Deposits (*i.e.*, $116,356 will be deposited by the Debtor into a segregated debtor-in-possession bank account entitled "Utility Deposit DIP Account" for the sole benefit of the Utility Companies.  The funds in the Utility Deposit DIP Account will not be commingled with any other funds of the Debtor, and the only distributions permitted to be made from the Utility Deposit DIP Account will be distributions

---

[1]  The list attached as **Exhibit "A"** to the Yi Declaration does not include any Utility Companies (and/or utility accounts) that provide utility services at the Retail Stores which the Debtor is seeking to close on or shortly after the Petition Date (as set forth in the motion, filed on June 15, 2017, to reject the unexpired non-residential real property leases for the Retail Stores to be closed on or shortly after the Petition Date), or for stores that the Debtor vacated prepetition.

made to one or more of the Utility Companies (but only up to the respective allowed amounts of the Utility Companies' Cash Deposits) or as otherwise authorized by the Court.

2. In the event that the Debtor fails to make a timely payment to a Utility Company for post-petition utility services, the Utility Company may make a written request for a distribution from the Utility Deposit DIP Account in the amount of the post-petition default ("Distribution Request"). The Distribution Request must be sent by the Utility Company, via both e-mail and United States first-class mail, to the Debtor and its bankruptcy counsel, as follows: (i) Cornerstone Apparel, Inc., Attn: Tae Yi, Address: 5807 Smithway Street, Commerce, California 90040, Email: tyyi777@yahoo.com and (ii) Levene, Neale, Bender, Yoo & Brill, L.L.P., Attn: Juliet Y. Oh, Address: 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067; Email: JYO@LNBYB.com. The Distribution Request must clearly note the alleged post-petition default amount and the utility account number(s) to which such post-petition default amount relates.

3. The Debtor will have ten (10) calendar days after the date of receipt of the Distribution Request (the "Cure Period") to cure the alleged post-petition default and to bring the utility account(s) post-petition current. If the Debtor is unable, or otherwise fails, to cure such alleged post-petition default within the Cure Period, the Debtor must issue and distribute a check for the amount requested in the Distribution Request from the Utility Deposit DIP Account to the applicable Utility Company within seven (7) calendar days after the date of expiration of the Cure Period. The Debtor shall have the right to seek a determination by the Court that the Debtor is not in post-petition default and/or that the amount of the alleged post-petition default set forth in a Distribution Request is inaccurate, which right shall not be deemed waived in the event that the Debtor issues and distributes a check for the amount requested in a Distribution Request in accordance with the procedures set forth herein.

3

4.    In no event shall any Utility Company receive distributions from the Utility Deposit DIP Account in excess of the respective allowed amount of such Utility Company's Cash Deposit.

5.    In the event that the Debtor terminates the services of any Utility Company and after all post-petition invoices owed by the Debtor to that Utility Company have been paid, the Debtor shall be authorized to withdraw from the Utility Deposit DIP Account the amount of the Utility Deposit attributable to the Utility Company whose services have been terminated, minus the amount of any outstanding and unpaid post-petition invoices owed by the Debtor to that Utility Company.

The source of the funds to be used to pay the proposed Cash Deposits to the Utility Companies will be the Debtor's cash on hand, which will be deposited into segregated account solely for the use of holding and paying the Cash Deposits, as needed. The Debtor has no secured lender and therefore the Debtor's cash and the Cash Deposits are not the cash collateral of any lender.

## ADDITIONAL INFORMATION

This Motion is based upon Local Bankruptcy Rules 2081-1(a)(4) and 9075-1, and 11 U.S.C. § 366, this Motion, the supporting Memorandum of Points and Authorities, the Omnibus Declaration of Tae Yi filed concurrently herewith, the arguments and statements of counsel made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor has served the Motion upon the Office of the United States Trustee, the 20 largest unsecured creditors of the Debtor, the Utility Companies, and parties requesting special notice via overnight mail. Hard copies of this Motion are available upon request to the Debtor's proposed counsel whose contact information is located on the upper-left hand corner of this Motion. Upon obtaining a hearing date/time from the Court, the Debtor will serve notice of the hearing on this Motion via overnight mail.

**WHEREFORE**, the Debtor respectfully requests that this Court hold an emergency hearing on the Motion and issue an order:

(1)  affirming the adequacy of the notice given;

(2)  granting the Motion in its entirety;

(3)  authorizing the Debtor to provide adequate "assurance of payment" to the Utility Companies in the form of Cash Deposits in the amounts proposed in the Motion, and in accordance with the Procedures and other terms and conditions described in the Motion;

(4)  deeming the Cash Deposits to constitute adequate "assurance of payment" pursuant to 11 U.S.C. § 366(c);

(5)  prohibiting each of the Utility Companies from altering, refusing, or discontinuing services to the Debtor without further order of this Court;

(6)  requiring the Utility Companies that receive Cash Deposits whose services are terminated by the Debtor to immediately refund a Utility Deposit (with no offset for prepetition claims), provided that all post-petition invoices have been paid; and

(7)  granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  June 15, 2017              CORNERSTONE APPAREL, INC.


                                   By:    /s/ Eve H. Karasik.
                                        TIMOTHY J. YOO
                                        EVE H. KARASIK
                                        JULIET Y. OH
                                        LEVENE, NEALE, BENDER, YOO
                                           & BRILL L.L.P.
                                        Proposed Attorneys for Debtor and
                                        Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

**A.    Background.**

1.    On June 15, 2017 (the "Petition Date"), Cornerstone Apparel, Inc. d/b/a Papaya Clothing, a California corporation and the debtor and debtor- in-possession herein (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    Cornerstone Apparel, Inc. operates a chain of apparel stores under the name Papaya Clothing ("Papaya") that cater to teens, juniors and the "young at heart," and focuses on the 16 to 25 year old age group. Cornerstone has over 80 stores located in malls and shopping centers throughout the United States. The Papaya concept is to provide shoppers with "great price, great service," and an "innovative, upscale and welcoming atmosphere."

3.    Cornerstone is based in Commerce, California with a 75,000 square feet headquarters complex, which includes its warehouse and distribution facilities. The merchandise sold in the Papaya stores is manufactured in the United States, and is housed in Cornerstone's California warehouse where Cornerstone's employees pack and ship the merchandise to the retail locations. Given the ever-changing fashion world, Cornerstone has established a production line that can take a new design from start to finish within a two-week period in order to give the customer an impressive selection of the latest fashions.

4.    Cornerstone's ownership and management have over twenty-five years' experience in operating retail clothing business focusing primarily in the junior and petite apparel markets. This ownership and management team is responsible for the prior successes of retailers Everblue Casuals and Career Image. Papaya consistently leads in its retail category in sales per square foot of retail space.

5.    The Debtor employs a workforce of approximately of 1,300 employees. In 2016, the Debtor generated annual gross revenues of more than $134 million. The Debtor has no secured

debt.

6.      After opening its first retail store approximately 18 years ago in 1999, the Debtor substantially expanded its business operations to encompass a total of over 80 of retail stores throughout the United States by 2017. Approximately, 50 of these new retail stores were opened within the last six (6) years.  The expansion effort took a heavy financial toll on the business operations of the Debtor as a whole as it incurred construction and other "start up" costs with the opening of each new store as well as a significant increase in operating expenses typically associated with a retail store chain operation.

7.      The high cost of expansion combined with decreasing store sales as a result of a general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the resulting increased competition, has left Cornerstone with insufficient liquidity to meet all of its financial obligations. While the Debtor has already closed a number of its less profitable retail store locations, leaving open approximately 80 retail stores as of the Petition Date, the Debtor requires time to evaluate the viability of the remaining retail stores and identify other ways to decrease operational costs and increase profitability.  In order to preserve the Debtor's rights under its lease agreements and to have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

8.      Through its bankruptcy case, the Debtor intends to identify the core Retail Stores around which the Debtor can successfully reorganize, to expeditiously close those Retail Stores which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the landlords, to identify and implement reasonable cost cutting measures and to maximize the value of the Debtor's inventory by continuing its retail operations at the Retail Stores, all of which the Debtor believes will enable it to formulate and pursue confirmation of a plan of reorganization which allows the Debtor to restructure its existing debt in a cohesive and efficient manner while continuing to operate its longstanding business.

**B.      The Utility Companies.**

9.      The Debtor conducts its business from its corporate office and warehouse facility located at 5807 Smithway Street, Commerce, California 90040 (the "Corporate Facility") and its

over 80 retail stores located primarily in shopping malls throughout the state of California (collectively, the "Retail Stores," and individually, a "Retail Store").

10.    In connection with the operation of the Debtor's business, the Debtor receives water, electricity, telephone, internet, trash and/or similar utility services from a number of utility companies (each a "Utility Company," and collectively, the "Utility Companies").  Given the importance of the services provided by the Utility Companies to the continued operation of the Debtor's business, it is crucial that the means of providing adequate assurance to the Utility Companies that provide utility services at the Debtor's Corporate Facility and the Retail Stores be determined promptly so that there is no interruption in the services provided.

11.    Attached as **Exhibit "A"** to the Omnibus Declaration of Tae Yi (the "AYA Declaration") filed concurrently herewith and incorporated herein by this reference, is a list which sets forth the name and address of each Utility Company that is currently providing utility services to the Debtor's Corporate Facility and/or the Retail Stores, the type of utility service provided by each Utility Company, the account number(s) associated with each Utility Company, and the amount of the cash deposit proposed to be paid for each Utility Company as adequate assurance of payment (collectively, the "Cash Deposits," and individually, a "Cash Deposit").

12.    As noted above, and as reflected in **Exhibit "A"** hereto, the Debtor is generally proposing to provide for each of the Utility Company providing services to the Debtor's Corporate Office and/or the Retail Stores[2] with a Cash Deposit in an amount equal to one month's average cost for utility consumption based on the historical utility costs incurred on the utility account(s) (as determined by the last three monthly or bi-monthly invoice amounts for such utility accounts). The total aggregate amount of the Cash Deposits proposed to be paid for the Utility Companies by the Debtor is $116,356.

---

[2]The list attached as **Exhibit "A"** to the Yi Declaration does not include any Utility Companies (and/or utility accounts) that provide utility services at the Retail Stores which the Debtor is seeking to close on or shortly after the Petition Date (as set forth in the motion, filed on June 15, 2017, to reject the unexpired non-residential real property leases for the Retail Stores to be closed on or shortly after the Petition Date), or for stores that the Debtor vacated prepetition.

13.     In addition to the Cash Deposits, the Utility Companies will be kept current on all post-petition amounts payable to such Utility Companies.

14.     The source of the funds to be used to pay the proposed Cash Deposits to the Utility Companies will be the Debtor's cash on hand, which will be deposited into segregated account solely for the use of holding and paying the Cash Deposits, as needed.  The Debtor has no secured lender and therefore the Debtor's cash and the Cash Deposits are not the cash collateral of any lender.

**C.     Proposed Procedures For Distribution Of The Cash Deposits.**

15.     Given the large number of Utility Companies which provide utility services to the Debtor at its Corporate Office and/or the Retail Stores which will continue to remain open, and the logistical difficulty and expense associated with issuing and distributing individual checks for the Cash Deposits to the Utility Companies within the first thirty (30) days of the Debtor's Chapter 11 bankruptcy case, the Debtor seeks to establish the following procedures (the "Procedures") for distributing the Cash Deposits to the Utility Companies:

a.     Upon the granting of this Motion, the total amount of the Cash Deposits (*i.e.*, $116,356) will be deposited by the Debtor into a segregated debtor-in-possession bank account entitled "Utility Deposit DIP Account" for the sole benefit of the Utility Companies.  The funds in the Utility Deposit DIP Account will not be commingled with any other funds of the Debtor, and the only distributions permitted to be made from the Utility Deposit DIP Account will be distributions made to one or more of the Utility Companies (but only up to the respective allowed amounts of the Utility Companies' Cash Deposits) or as otherwise authorized by the Court.

b.     In the event that the Debtor fails to make a timely payment to a Utility Company for post-petition utility services, the Utility Company may make a written request for a distribution from the Utility Deposit DIP Account in the amount of the post-petition default ("Distribution Request").  The Distribution Request must be sent by the Utility Company, via both e-mail and United States first-class mail, to the Debtor and its bankruptcy counsel, as follows:  (i) Cornerstone Apparel, Inc., Attn: Tae Yi; Address: 5807

9

Smithway Street, Commerce, California 90040, Email: tyyi777@yahoo.com; and (ii) Levene, Neale, Bender, Yoo & Brill, L.L.P., Attn: Juliet Y. Oh, Address: 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067; Email: JYO@LNBYB.com. The Distribution Request must clearly note the alleged post-petition default amount and the utility account number(s) to which such post-petition default amount relates.

c.    The Debtor will have ten (10) calendar days after the date of receipt of the Distribution Request (the "Cure Period") to cure the alleged post-petition default and to bring the utility account(s) post-petition current. If the Debtor is unable, or otherwise fails, to cure such alleged post-petition default within the Cure Period, the Debtor must issue and distribute a check for the amount requested in the Distribution Request from the Utility Deposit DIP Account to the applicable Utility Company within seven (7) calendar days after the date of expiration of the Cure Period. The Debtor shall have the right to seek a determination by the Court that the Debtor is not in post-petition default and/or that the amount of the alleged post-petition default set forth in a Distribution Request is inaccurate, which right shall not be deemed waived in the event that the Debtor issues and distributes a check for the amount requested in a Distribution Request in accordance with the procedures set forth herein.

d.    In no event shall any Utility Company receive distributions from the Utility Deposit DIP Account in excess of the respective allowed amount of such Utility Company's Cash Deposit.

e.    In the event that the Debtor terminates the services of any Utility Company and after all post-petition invoices owed by the Debtor to that Utility Company have been paid, the Debtor shall be authorized to withdraw from the Utility Deposit DIP Account the amount of the Utility Deposit attributable to the Utility Company whose services have been terminated, minus the amount of any outstanding and unpaid post-petition invoices owed by the Debtor to that Utility Company.

## II.    **DISCUSSION**

Pursuant to 11 U.S.C. § 366, a utility may not alter, refuse, or discontinue services to, or discriminate against, a debtor solely on the basis of the commencement of the bankruptcy case or the debtor's failure to pay a prepetition debt, unless the debtor fails to furnish adequate assurance of payment for postpetition services, in the form of a deposit or "other security."  Specifically, 11 U.S.C. § 366 provides as follows:

> "(a) Except as provided in subsections (b) and (c) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, . . . the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for services rendered before the order for relief was not paid when due.
> . . .
>
> (b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.  On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment."
>
> (c)(2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor . . . adequate assurance of payment for the utility service that is satisfactory to the utility.
>
> (3)(A) On request of a party in interest and after notice and a hearing, the court may order the modification of the amount of an assurance of payment under paragraph (2)."

11 U.S.C. § 366.

Section 366 of the Bankruptcy Code is intended to apply to entities providing electricity, natural gas, water, and/or telephone services, as well as any other entity that supplies services that cannot be readily obtained or replaced elsewhere, or which has a monopoly with respect to the services it provides the debtor.  As explained by the legislative history,

> [Section 366] is intended to cover utilities that have some special position with respect to the debtor, such as electric company, gas supplier, or telephone company that is a monopoly in the area so that the debtor cannot easily obtain comparable service from another utility.

H.R. Rep. No. 95-595, at 350 (1977); S. Rep. No. 95-989, at 60 (1978); *see In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986) (landlord for Brooklyn Navy Yard "occupies a special position with respect to the debtor in its role as [the debtor's] utility supplier").

Pursuant to Section 366(c)(2) of the Bankruptcy Code, during the first thirty (30) days following the commencement of a voluntary Chapter 11 bankruptcy case, a utility may not alter, refuse, or discontinue service to, or discriminate against, a debtor solely on the basis of the commencement of the case or the failure of the debtor to pay a pre-petition debt for utility services provided.[3]  Following the foregoing 30-day period, however, utility companies may alter, refuse or discontinue service if the debtor does not furnish adequate "assurance of payment" of post-petition utility service obligations that is satisfactory to the relevant utility.

Section 366(c)(1)(A) of the Bankruptcy Code provides that a debtor must provide "assurance of payment" in the form of a cash deposit, a letter of credit, a certificate of deposit, a surety bond, a prepayment of utility consumption, or another form of security that is mutually agreed on between the utility and the debtor.  11 U.S.C. § 366(c)(1)(A).

Under Section 366(c) of the Bankruptcy Code, this Court has exclusive responsibility for determining what constitutes adequate assurance of payment of post-petition utility charges and is not bound by local or state regulations.  *See, e.g. Begley v. Philadelphia Elec. Co. (In re Begley)*, 41 B.R. 402, 405-06 (Bankr. E.D. Pa. 1984); *Marion Steel Co. v. Ohio Edison Co. (In re Marion Steel Co.)*, 35 B.R. 188, 195 (Bankr. D. Ohio 1983) (pre-BAPCPA case finding that

---

[3] While Section 366(b) suggests that a utility may alter, refuse, or discontinue utility services to a debtor if the debtor fails to furnish adequate assurance of payment for postpetition services within 20 days after the petition date, Section 366(c)(2) provides that, with respect to a case filed under Chapter 11 of the Bankruptcy Code, a utility may alter, refuse, or discontinue utility services to a debtor if the debtor fails to furnish adequate assurance of payment for postpetition services within 30 days after the petition date.

12

1    determinations of adequate assurance under section 366 are fully within the Court's discretion).

2        In the case herein, the Debtor proposes to provide adequate "assurance of payment" to

3    the Utility Companies providing services to the Debtor's Corporate Facility and the Retail Stores

4    in the form of the Cash Deposits, as authorized by Section 366(c)(1)(A)(i) of the Bankruptcy

5    Code, in the amounts set forth in **Exhibit "A"** to the Yi Declaration filed concurrently herewith.

6    The total amount of the Cash Deposits proposed to be paid is approximately $116,356.  As noted

7    above, the Debtor is generally proposing to provide each Utility Company with a Cash Deposit

8    in an amount equal to approximately  one month's average cost for utility consumption based

9    based on the historical utility costs incurred on the utility account(s), as determined by the last

10   three monthly or bi-monthly invoice amounts for such utility accounts.  In addition to the Cash

11   Deposits, the Utility Companies will be kept current on all post-petition amounts payable to such

12   Utility Companies.

13       The source of the funds to be used to pay the proposed Cash Deposits to the Utility

14   Companies will be the Debtor's cash on hand, which will be deposited into segregated account

15   solely for the use of holding and paying the Cash Deposits, as needed.  The Debtor has no

16   secured lender and therefore the Debtor's cash and the Cash Deposits are not the cash collateral

17   of any lender.

18                          **III.    CONCLUSION**

19       **WHEREFORE**, the Debtor respectfully requests that this Court hold an emergency

20   hearing on the Motion and issue an order:

21       (1)    affirming the adequacy of the notice given;

22       (2)    granting the Motion in its entirety;

23       (3)    authorizing the Debtor to provide adequate "assurance of payment" to the Utility

24   Companies in the form of Cash Deposits in the amounts proposed in the Motion and in

25   accordance with the Procedures and other terms and conditions set forth therein;

26       (4)    deeming the Cash Deposits to constitute adequate "assurance of payment"

27   pursuant to 11 U.S.C. § 366(c);

28

                                  13

(5)    prohibiting each of the Utility Companies from altering, refusing, or discontinuing services to the Debtor without further order of this Court;

(6)    requiring the Utility Companies that receive Cash Deposits whose services are terminated by the Debtor to immediately refund a Utility Deposit (with no offset for prepetition claims), provided that all post-petition invoices have been paid; and

(7)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  June 15, 2017                    CORNERSTONE APPAREL, INC.


By: _____*/s/ Eve H. Karasik.*_____
        TIMOTHY J. YOO
        EVE H. KARASIK
        JULIET Y. OH
        LEVENE, NEALE, BENDER, YOO
          & BRILL L.L.P.
        Proposed Attorneys for Debtor and
        Debtor in Possession